UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

IN RE:

MICHAEL WARREN REED,

CASE NO: 13-50202-KKS
CHAPTER 7

Debtor.

## CREDITOR MYRA REED'S OBJECTION AND MOTION TO STRIKE DEBTOR'S LATEST AMENDED SCHEDULES (DOC. 153)

COMES NOW the Plaintiff Creditor MYRA REED [hereinafter "Myra Reed"], by and through her undersigned attorneys, and, pursuant to Bankruptcy Rule of Civil Procedure, and other applicable Bankruptcy Rules, respectfully objects to and moves to strike Debtor's latest Amended Schedules. As grounds for said Motion, Myra Reed would show as follows:

### I - Background Facts

1. Debtor filed his Petition herein on March 20, 2013. See Doc. 1.

2. Debtor sought to have venue for this Panama City case moved to Tallahassee, but the Court ultimately denied said effort. See Doc. 50.

3. Debtor sought to have $153,000 in proceeds from non-exempt stock be held as part of a homestead purchase despite the closing having never occurred and no possession of right of possession of the alleged homestead ever being in Debtor, but the Court denied said effort. See Docs. 141 and 145.

4. Debtor has, counting the latest attempt, amended his Bankruptcy Schedules and Statement of Financial Affairs six times. See Docs. 18, 47, 115, 116, 138, and 153.

1

5. Debtor is attempting to convert his Chapter 7 case to a Chapter 13 case despite his Schedules, prior to the latest amendment effort, showing that he could not qualify to be a Chapter 13 debtor under the provisions of Bankruptcy Code Section 109(e). See Doc. 137.

6. Debtor's latest transparent effort to "game" the bankruptcy process is shown by Debtor's proposed Amended Schedules B (wherein a previously undisclosed alleged $1.1 million asset is suddenly disclosed), and D (wherein Myra Reed's Judgment claim in the principal amount of $922,873 is now shown as a fully secured claim, secured by the newly disclosed $1.1 million asset). See Doc. 153.

7. The previously undisclosed asset consists of an alleged "Equitable Interest 50% Ownership" in Summitt Enterprises Partners, Inc." [hereinafter the "Summitt Asset"]. See Doc. 153, Amended Schedule B.

8. However, Debtor has already testified about said asset in the bankruptcy proceeding as well as in his sworn testimony in state court.

9. Attached hereto and made a part hereof as Exhibit "A" are pages 77-79 of Debtor's sworn testimony given on March 18, 2013 (two days before he filed his Petition), regarding the Summitt Asset, in a Proceedings Supplementary examination before Hon. James B. Fensom in Debtor's divorce case in Bay County Circuit Court. (These pages are part of the full transcript which was already filed with the Court in Doc. 77, Exhibit 6, identified as "#7" on Docket).

10. As is plain from the sworn testimony on March 18, 2013, Debtor had already sold the Summitt Asset to his friend, Richard Cox, long before the filing of his Bankruptcy Petition on March 20, 2013, and Debtor did not disclose the alleged $1,100,000 asset in his initial or later amended Schedule B. See Docs. 26 and 115.

11. Further, Debtor's statement on March 18, 2013, was that the Summitt Asset "...was not worth anything." Page 77, Line 5, of Debtor's sworn testimony on March 18, 2013. See Exhibit "A" and Doc. 77, Exhibit 6, identified as "#7" on Docket.

12. In addition, Debtor makes numerous other statements regarding the worthlessness of the Summitt Asset to him. See Exhibit "A" and Doc. 77, Exhibit 6, identified as "#7" on Docket.

## II - Memorandum of Law

13. A motion to strike amended schedules for bad faith and prejudice to creditors is appropriate. See, for example, *In re Jordan*, 335 B.R. 215 (Bankr. M.D. Fla. 2005).

14. In *Jordan*, the trustee actually failed to file a motion to strike and instead only objected to debtors' bad faith attempt to conceal their ownership of real property, but the result was still the disallowance of amended schedules. *Id.*

15. In the instant case, the bad faith is shown by Debtor's perjury either before the state court judge (as evidenced in the attached transcript) or before this Court in the proposed Amended Schedules B and D. See Exhibit "A" and Doc. 153.

16. The prejudice to the only significant unsecured creditor in this case, Myra Reed, is that it is a transparent effort by Debtor and his counsel to overcome the standards of who may be a Chapter 13 debtor. See Section 109(e) of the Bankruptcy Code (less than $360,475 of liquidated unsecured debt and less than $1,081,400 of liquidated secured debt).

17. Debtor's transparent effort to overcome Myra Reed's unsecured and unsatisfied Judgment (in the principal amount of greater than $922,000) by alleging there is a new asset worth $1.1 million, seems to still fall short of Debtor's wrongful motive when it is noted that secured creditor Samuel T. Adams, a/k/a Tom Adams (Debtor's friend and attorney), is allegedly

owed approximately $270,000 (Debtor has never corrected the error in Schedule D even as now amended as to the Tom Adams' debt despite both Debtor and Tom Adams testifying at their 2004 exams that Tom Adams is not owed more than $500,000, but rather approximately $270,000). See Doc. 122.

18. Based upon past transparent manipulations of Schedules, however, it is likely that Debtor has further amendments in the works to manipulate the alleged Tom Adams debt, too.

19. A secured debt requires collateral, and plainly there is no collateral to secure Myra Reed's liquidated unsatisfied Judgment in the principal amount of greater than $922,000, and Debtor admits as much in his 2004 exam (page 91, lines 8 - 14, is where Debtor admits the transfer of the Summitt Asset to Richard Cox). See Doc. 122.

20. Because Debtor's latest attempt to amend schedules (Doc. 153) is a bad faith attempt to prejudice creditor Myra Reed, Doc. 153 should be stricken (although Debtor should be allowed to amend Schedule D to more accurately reflect the status of Tom Adams' alleged secured claim).

21. Pursuant to Local Rules, after inquiry from the undersigned to Debtor's counsel, Debtor did not consent to the relief requested by Myra Reed as set forth herein.

WHEREFORE Myra Reed respectfully prays that the Court enter an order striking Debtor's latest amended Schedules B and D (Doc. 153) and granting such other relief (including, but not limited to, sanctions against Debtor's counsel) as the Court deems just and proper.

BURKE BLUE
HUTCHISON WALTERS & SMITH, P.A.
Attorneys for Myra Reed
/s/ DOUGLAS L. SMITH
DOUGLAS L. SMITH, ESQ.

Florida Bar No. 0816140
221 McKenzie Avenue
Post Office Box 70
Panama City, Florida 32402
(850) 769-1414
Fax (850) 784-0857
E-Mail: dsmith@burkeblue.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing has been delivered via electronic mail or regular U.S. Mail to the following addressees through the ECF System:

Thomas B Woodward, Esq.
Po Box 10058
Tallahassee, Fl 32301
Attorney for Michael W. Reed

United States Trustee
110 E. Park Avenue, Suite 128
Tallahassee, Fl 32301

Ronald A. Mowrey, Esq.
Mark L. Mason, Esq.
515 North Adams Street
Tallahassee, FL 32301

Theresa M. Bender, Esq.
Chapter 7 Trustee
P.O. Box 14557
Tallahassee, FL 32317

on the 16th day of October, 2013.

BURKE BLUE
HUTCHISON WALTERS & SMITH, P.A.
Attorneys for Myra Reed

/s/ DOUGLAS L. SMITH
DOUGLAS L. SMITH, ESQ.
Florida Bar No. 0816140
221 McKenzie Avenue
Post Office Box 70
Panama City, Florida 32402
(850) 769-1414
Fax (850) 784-0857
E-Mail: dsmith@burkeblue.com

DLS:JAB 10/10/13 - F:\WPF\DLS\28746 Reed-Ojection-Amended-Schedules-Obj.wpd

```
                                                              76
 1      Q    More than five hundred thousand?
 2      A    I'm guessing, but it -- it was -- I think it
 3 was close to that.
 4      Q    You think it was close to half a million?
 5      A    I think so.
 6      Q    And what evidence do you have of that?  Do you
 7 have evidence?
 8      A    Well, I'm -- you have all the paperwork.
 9      Q    It wasn't in the box.  Are there any papers you
10 haven't produced to us?  We got the one box with the
11 papers all over it and that was your production.)  Is
12 there any other document production out there you haven't
13 given us?
14      A    I don't think so.
15      Q    Where did those papers come from?  The ones in
16 the box we got.
17      A    From accountants, records and so forth.
18      Q    Who would have the evidence of the alleged
19 payments you made toward the Annabella's deficiency?
20      A    Most likely Mr. Adams.
21      Q    Tom Adams?
22      A    (Witness nods head.)
23      Q    Now, when you transferred your interest in
24 Summit Enterprises to Richard Cox, you were aware that --
25 that Myra Reed had a security interest in that half
```



GULF BAY REPORTING



EXHIBIT A

1  interest in Summit Enterprises, right?
2      A    Yes.
3      Q    So you transferred it to him knowing she had a
4  security interest in it, right?
5      A    It was not worth anything.
6      Q    But Richard Cox knew she had a security
7  interest in it too, correct?
8      A    I would say so.
9      Q    Because you both talked about it, right?  Now
10 what was the purpose of you transferring your half
11 interest in the Summit to Richard Cox?  What was the
12 purpose of that?
13     A    Well, the -- the thing that -- Summit was
14 upside down in terms of payments, in terms of value.
15 There was no value to it.  In fact a negative value to
16 it.
17     Q    But it threw off cash, didn't it?
18     A    No, I don't think so.  You look at it.  It
19 was -- it had a negative cash flow.  Definitely had a
20 negative cash flow.
21     Q    Well, was the transfer to Richard Cox -- what
22 did he pay you for it?
23     A    I don't recall that.
24     Q    It was one of those dollar transfers?
25     A    Well I don't even know if it was that, but it

Michael Reed v. Myra Reed                                    3/22/2013

                                                                    78

1   was -- but it was -- I was glad to get rid of it at the
2   time because it was, it was a negative cash flow, and I
3   tried to make whatever cash calls I could on it, but I
4   couldn't do it at the time.
5        Q    Well did you transfer it to him so that Myra
6   Reed wouldn't have access to it?
7        A    I didn't do that.
8        Q    Well you're the one that -- you're the one that
9   transferred it to him.
10       A    I don't think he wanted to be in business with
11  her.
12       Q    What's the status of the pre-paid college plans
13  you have for your children?
14       A    They're -- I paid -- in the '90s I paid a full
15  pre-paid for Cole (phonetic), Terra (phonetic) and Logan
16  (phonetic).
17       Q    Would it be appropriate for you to go ahead and
18  make copies of those plans so, and provide them to Myra
19  Reed so she --
20       A    No, she's asked -- she's me to do that.
21       Q    And will you do it?
22       A    Yeah, it's just -- I got it off the computer.
23       Q    Now am I correct you have your medical license
24  back now?
25       A    Not yet but, I mean, it's been given back to

                        GULF BAY REPORTING